UNITED STATES of America, Plaintiff,

v.

LOCAL 295 OF the INTERNATIONAL BROTHERHOOD OF TEAMSTERS, Executive Board of Local 295 of the International Brotherhood of Teamsters, Local 851 of the International Brotherhood of Teamsters, Executive Board of Local 851 of the International Brotherhood of Teamsters, Frank Manzo, Harry Davidoff, Mark Davidoff, Sharron Moskowitz, Nancy Siano, Frank Calise, Anthony Calagna, Michael Urso–Pernice, Robert Reinhardt, Leone Manzo, Richard Schroeder, Anthony Guerrieri, Thomas Greco, Carmelo Amato, Defendants.

No. 90 CV 0970.

United States District Court, E.D. New York.

Jan. 31, 1992.

Andrew J. Maloney, U.S. Atty., E.D.N.Y. (Pamela R. Perron, Thomas A. Carr, Varuni Nelson, Christopher G. Lehmann, Joseph D. McCann, of counsel), Brooklyn, N.Y., for plaintiff.

Gordon, Hurwitz, Butowsky, Weitzen, Shalov & Wein (Victor Rocco, Lawrence Zweifach, of counsel), Ira Drogin, New York City, for defendants Local 295 of the

Intern. Broth. of Teamsters and Executive Bd. of Local 295 of the International Brotherhood of Teamsters.

Goldman & Hafetz (Frederick P. Hafetz, Edward R. Harris, of counsel), New York City, for defendants Local 851 of Intern. Broth. of Teamsters and Executive Bd. of Local 851 of the Intern. Broth. of Teamsters.

Pat V. Stiso, Bronx, N.Y., for defendants Frank Manzo and Leone Manzo.

Shaw, Licitra, Esernio & Schwartz (J. Stanley Shaw, of counsel), Garden City, N.Y., for defendants Harry Davidoff and Mark Davidoff.

Stillman, Friedman & Shaw (Charles A. Stillman, of counsel), New York City, Robert D. Foglia, Ridgewood, N.J., for defendant Sharron Moskowitz.

Nancy Siano, pro se.

Frank Calise, pro se.

Michael B. Pollack, New York City, for defendant Anthony Calagna.

Simon & Miller (Herbert Simon, of counsel), for defendants Michael Urso–Pernice and Robert Reinhardt).

Sutter, Marten & Lawrence (John Joseph Sutter, of counsel), Mineola, N.Y., for defendant Richard Schroeder.

Richard Rehbock, New York City, for defendants Anthony Guerrieri, Thomas Greco and Carmelo Amato.

## MEMORANDUM AND ORDER

NICKERSON, District Judge:

The amended complaint of United States names as defendants two Locals, Local 295 and Local 851, of the International Brotherhood of Teamsters, AFL–CIO (the Teamsters International) and related officers and alleged co-conspirators, and alleges violations of the *Racketeer Influenced and Corrupt Organizations Act (RICO)*, 18 U.S.C. §§ 1961–1968, including nineteen acts of racketeering.

The United States moves for the second time for the appointment of a trustee for Local 295.

The court assumes familiarity with its previous memoranda and orders dated March 7, 1991, 1991 WL 35497; June 28, 1991, 1991 WL 128563; and July 23, 1991.

### I.

The amended complaint seeks a preliminary injunction: (1) enjoining defendants from violating the federal racketeering laws; (2) enjoining individual defendants from participating in the affairs of, or dealing with officers or employees of, Locals 295 and 851 or Local 851's Pension and Welfare Funds; (3) enjoining current Executive Board members of both Locals from taking any action for their organizations; (4) removing all officers and trustees of Locals 295 and 851 and their Executive Boards and of Local 851's Pension and Welfare Funds; (5) appointing one or more trustees, *pendente lite*, for both Locals and Local 851's Pension and Welfare Fund; and (6) ordering the trustee to conduct general elections to elect officers for the Executive Boards of both Locals.

The United States also seeks a permanent injunction (1) prohibiting the individual defendants from dealing with any member, officer, representative or agent of the Locals, their Executive Boards, and Local 851's Pension and Welfare Funds; (2) making permanent any provision of the preliminary injunction the Court deems appropriate; and (3) divesting from individual defendants their interest in the racketeering enterprise alleged in the complaint.

### II.

By Memorandum and Order dated March 7, 1991, this court denied the motion of various defendants to dismiss. The court struck as moot the claim for the injunctive relief barring defendant Frank Manzo from future dealings with any labor union, because the Consent Judgment in the United States District Court in the Southern District of New York had already granted the United States that relief. *United States v. International Bhd. of Teamsters*, 88 Civ. 4486 (Edelstein, J.) (S.D.N.Y. Mar. 14, 1989). The court also granted partial summary judgment for the United States re-

quiring defendants Frank Calise and Harry Davidoff jointly and severally to disgorge $961,400 and barring them from future dealings with any labor organization. The court denied partial summary judgment with respect to Manzo and the Locals for divestiture on the ground that factual disputes remain.

In a June 28, 1991 Memorandum and Order, this court amended its order requiring Calise and Davidoff to disgorge. This court rescinded its holding that they were jointly and severally liable for the $961,400 and postponed until after discovery a finding of the amount each must pay of that amount.

In a July 23, 1991 Memorandum and Order, this court adopted the findings made in *Investigations Officer v. Anthony Calagna, Sr., Michael Urso–Pernice, Robert W. Reinhardt, Anthony Calagna, Jr., Salvatore E. Cataldo, Ralph Delsardo, and John Moran, Jr.,* Decision of the Independent Administrator, (June 14, 1991) (Lacey), under the Teamsters International Consent Decree in the District Court for the Southern District of New York concerning the ongoing corruption of Local 295. *United States v. Local 295 of the Int'l Bhd. of Teamsters,* No. 90 CV 0907, 1991 U.S. Dist. LEXIS 10669 (E.D.N.Y. July 31, 1991). In that June 14, 1991 decision, former Judge Frederick B. Lacey said, "In my two years as Independent Administrator, I have seen few IBT [Teamsters International] Locals with the sullied reputation associated with Local 295, a reputation richly deserved, as reflected by the record in this case." (at 24).

Based on those findings, Judge David N. Edelstein sustained former Judge Lacey's decision to remove and permanently bar all but one member from the Executive Board of Local 295 and to appoint a temporary trustee to run the daily operations of the Local.

This court declined to appoint a permanent trustee for Local 295 in light of Judge Edelstein's appointment of a temporary trustee. Instead, the court said that the United States could "renew its motion at a future time if the temporary trustee arrangement proves inadequate". *Id.* at 4.

The United States now moves again for the appointment of a permanent trustee. The United States points to the conviction of the former president of Local 295, Anthony Calagna, for extortion on August 8, 1991; a letter to this court from former Judge Lacey outlining the institutional limitations of the present Temporary Trustee; portions of the record of proceedings in the District Court in the Southern District of New York; and a Declaration and attached exhibits of Special Agent James Malley, a federal law enforcement official, chronicling patterns of extortion and intimidation by the former officers of Local 295 and their involvement with La Cosa Nostra. *See* documents, correspondence, depositions, court records, and other material collected in the Declaration of Assistant U.S. Attorney Christopher Lehmann. Hereinafter references are to exhibits contained in this declaration.

### III.

#### A.

Former Judge Lacey found on June 14, 1991 that the former Executive Board members were derelict in failing to investigate corruption within Local 295. The first question is whether the present Temporary Trustee should be given a chance to stamp out any ongoing corruption.

The United States contends that the Consent Decree and the IBT Teamsters International Constitution limited former Judge Lacey's selection options by requiring that a trustee be a Teamsters International member. He said in a letter to this court that the present trustee, William Ferchak, while competent to perform the business functions of the Local's Executive Board, lacks the skills and experience necessary to investigate and remove any possible corruption still plaguing the union.

In his affidavit submitted on the present motion by defendant Local 295, Ferchak outlined his credentials and job experience and summarized the nature of his work as the Temporary Trustee of Local 295. No-

where did he suggest any experience investigating corruption. Nor did he mention any present efforts or future plans to investigate possible corruption. Ferchak's discussion of the challenges facing Local 295 deal primarily with business operations and contract negotiations. The two times he specifically refers to "problems" of Local 295 are in connection with "negotiating a collective bargaining agreement" and confirming with a bank his "exclusive authority to sign union checks".

Ferchak does say that "an objective of the Consent Order [from Judge Edelstein] is to rid the [Teamsters International] of any influence of organized crime. My Trusteeship over the affairs of Local 295 will be highly sensitive to ensuring compliance with this important policy." But he does not mention the specific corruption of Local 295, nor does he say what, if any, actions he has taken or plans to take to achieve reform. He plainly conceives of his role solely to conduct the business affairs and negotiations of Local 295 in a professional manner. He is not, nor does he pretend to be, capable of conducting a sustained, aggressive investigation into potentially ongoing corruption involving organized crime.

Local 295 also says that the Teamsters International Investigations Officer continues to monitor the Local and has conducted a recent financial audit. But under the terms of the Consent Decree, the Independent Administrator's and Investigations Officer's positions will expire nine months after the election of International Officers. Those elections have recently been held. Former Judge Lacey says that the Temporary Trustee could continue beyond that date, but cautions that "the resources and support of [Lacey's] office, the Investigation Officer's office and Judge Edelstein may no longer be available". Moreover, the Independent Administrator's Office has responsibility for all of the manifold problems involving the Teamsters International.

■ This court is mindful that Congress considered the appointment of a trustee to run the affairs of a union local as an extraordinary measure.

Absent some clear cut limitations on the use of this remedy [a civil RICO trusteeship], there is a valid public concern that the tremendous power which the statute offers may be abused ....

In the case of labor unions, the Department of Justice should study and consider the feasibility and potential effectiveness of alternative remedies for the Government, short of the imposition of a civil RICO Trusteeship. A trusteeship is clearly an extreme remedy....

*Federal Government's Use of the RICO Statute and Other Efforts Against Organized Crime*, S.Rep. No. 407, 101st Cong., 2d. Sess., at Sec. XII, 1990 WL 201659 (Leg.Hist.) [Hereinafter *"Senate Report"*].

■ This court is satisfied that it is faced with an extraordinary situation. *See United States v. Local 560, Int'l. Bhd. of Teamsters*, 581 F.Supp. 279 (D.N.J.1984), *aff'd* 780 F.2d 267 (3d Cir.1985), *cert. denied* 476 U.S. 1140, 106 S.Ct. 2247, 90 L.Ed.2d 693 (1986); *United States v. Local 30, United Slate*, 686 F.Supp. 1139, 1168 (E.D.Pa.1988); *United States v. International Bhd. of Teamsters*, 905 F.2d 610, 612–13 (2d Cir.1990) (summarizing Consent Decree appointing trustee for Teamsters International). Contrary to the argument of Local 295, vestiges of its old regime are not gone. The record establishes, without significant evidentiary dispute, a consistent and extended pattern of racketeering and extortion and a sufficiently strong possibility that the corruption persists to warrant a special remedy from the court. "The implementation of trusteeships under civil RICO is no longer a novel, one-time experiment. It is quickly being recognized as an extremely valuable part of effective law enforcement." *Senate Report*, at Sec. I.

Moreover, Judge Edelstein has already followed former Judge Lacey's recommendation and removed Local 295's Executive Board and appointed a Temporary Trustee. This court must now decide whether to transform the Trusteeship into one capable of conducting investigations as well as negotiations.

**B.**

This court may appoint a trustee to oversee the affairs of a local union under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1964(a). *United States v. Local 560, Int'l Bhd. of Teamsters,* 581 F.Supp. 279 (D.N.J.1984). *See also United States v. Local 30, United Slate,* 686 F.Supp. 1139, 1168 (E.D.Pa.1988) (establishing "decreeship" which retained new union leadership but imposed close court scrutiny and appointed "liaison officer" between union and court).

In determining whether injunctive relief is warranted, this court applies a preponderance of the evidence standard to determine whether there have been violations of a statute and whether there is a likelihood that the violations will continue. *Local 30,* 686 F.Supp. at 1164 and cases cited; *Local 560,* 581 F.Supp. at 327-28 (applying preponderance of evidence standard).

The amended complaint alleges a long history of corrupt acts by numerous members of Local 295's Executive Board. Some of these comprise nineteen acts of racketeering in violation of RICO, 18 U.S.C. §§ 1961—1968. In the words of former Judge Lacey's June 14, 1991 decision:

[T]he evidence presented to me demonstrates that from at least 1975, until the present, Local 295, its officers, former officers, employers of its members, and others associated with the Local Union, have been the subject of repeated and ongoing allegations and findings of corruption, including La Cosa Nostra infiltration into the Local.

*reprinted* in Lehmann Ex. 1 at 12.

Institutional practices and traditions tend to endure long after specific individuals are gone. The evidence establishes that the corruption in Local 295 was not simply in practice, but in spirit and belief. Organized crime certainly has the power—both through inducement and intimidation—to continue asserting itself in the affairs of Local 295.

In Local 295 the corruption has been extensive in terms of diversity, duration, and number of people involved. Many of the guilty do not appreciate the gravity of their crimes. None of their associates has displayed any interest in reforming the union. The record shows a smug, almost contemptuous, indifference to the presence of organized crime in union affairs by a number of former union officials and an active effort by many in Local 295 to thwart reform.

On January 3, 1991, Anthony Calagna, Sr., (Calagna), President of Local 295 from 1986 to 1991, was convicted of extortion and conspiracy to extort money from P.C. Delivery Services, Inc.. *United States v. Calise, Calagna, and Schroeder,* CR 89–308(s) (E.D.N.Y. April 12, 1991) (Nickerson, J.) (weekly payoff in extortion scheme continued through December 1987). Investigations by the Federal Bureau of Investigations (FBI), show that Calagna is a member of the Lucchese Organized Crime Family of La Cosa Nostra. In fact, when Lucchese Family associate and former President of Local 295 Frank Calise was convicted and removed from office, the Lucchese Family made Calagna a mafia "soldier" and arranged for his election as President of Local 295 even though he was not a member of Local 295 at the time.

FBI records as well as Calagna's testimony chronicle his contacts with, and special favors for, members of organized crime, as well as his failure to investigate union corruption.

After his conviction and removal from office, former Local 295 Vice President Robert Reinhardt assumed the presidency while Anthony Cuozzo became Vice President. Cuozzo was Chairman of the Anthony Calagna Defense Fund Committee. On June 27, 1991, the Investigations Officer under Judge Edelstein's Consent Decree charged Anthony Cuozzo with "bring[ing] reproach upon the union, violating [his] fiduciary duties as a union officer, violating [his] oath and interfering with Local 295's and the IBT's legal obligations under the Consent Order, ... [and] knowingly associat[ing] with Calagna, a member of La Cosa Nostra."

The continued support of Calagna extended beyond Anthony Cuozzo to the entire Executive Board. The Executive Board embezzled union funds to pay for Anthony Calagna's Criminal Defense Counsel. At a meeting on May 16, 1989, two weeks after the criminal indictment of Calagna, the Executive Board agreed to pay the attorney's fees for him and authorized a $600.00 per week pay raise for him.

The Executive Board adopted a severance plan for the sole benefit of officers of Local 295 after the Board learned that Local 295 and its officers were the subject of an FBI investigation.

The officers of Local 295 also failed to investigate the charges against Calagna. The Executive Board did not consult Local 295's attorney about the legality of using union funds to pay for his criminal defense, although such legal advice was routinely sought for other matters. On June 2, 1989, Local 295 paid Michael Pollack, Esq., $50,000 to represent Calagna at his criminal trial.

This kind of treatment has not been accorded solely to Calagna. The Executive Board of Local 295 continues to make payments to another former officer who was indicted and convicted for abuse of his union office. On February 2, 1989, former Vice President of the Local 295, Harry Davidoff, along with others, was convicted of conspiracy and several acts of extortion. He and his co-defendants, who were either members or associates of the Lucchese Crime Family, used their positions and influence in Locals 851 and 295 to extort payoffs from various freight carriers in exchange for dropping employee demands during collective bargaining negotiations and ending strikes. Despite Davidoff's and his co-defendants' convictions, Local 295 continues to pay him $1,903 out of its general fund each month—totaling nearly one hundred thousand dollars in the last five years.

On June 14, 1991, former Judge Lacey issued a decision chronicling past union corruption and the Executive Board's apparent indifference to it. The Executive Board then consisted of Calagna, President; Michael Urso–Pernice, Secretary–Treasurer; Robert M. Reinhardt, Vice President; Anthony Calagna, Jr., Recording Secretary; Salvatore E. Cataldo, Trustee; Ralph Delsardo, Trustee; and John Moran, Jr., Trustee. Vice President Anthony Cuozzo was not a member of the Executive Board at that time and was therefore not charged by the Investigations Officer with wrongdoing. Later, however, the Investigations Officer did charge Cuozzo with associating with Calagna, a member of La Cosa Nostra.

Former Judge Lacey found that these Executive Board members had (1) violated their fiduciary duties by failing to investigate and to take action on numerous allegations of criminal acts by and convictions of present and former union officers and allegations of La Cosa Nostra involvement in the Local's affairs and (2) embezzled the Local's funds by paying Anthony Calagna's lawyer's fees and awarding him a substantial pay increase, by establishing a severance plan for union officers, by buying a car in violation of the Local's by-laws for Secretary–Treasurer Michael Hunt's retirement, and by making payments to Harry Davidoff since 1972 despite his conviction for extortion and conspiracy to extort Local 295 employers. (Lehmann Ex. 1).

The evidence assembled by the Investigations Officer and adopted by former Judge Lacey illustrates a uniform disregard by Local 295's former officers concerning the possible influence of organized crime in the union's affairs.

Asked whether, as a union official, he might be concerned if someone he knew might be tied to organized crime, Calagna replied at a hearing on November 2 and 19–23, 1990 before former Judge Lacey, "Not really, I didn't give a [expletive deleted]". Other Local 295 officers exhibited a similar disdain for their fiduciary duties. As the Investigations Officer wrote in his Post–Hearing Memorandum,

> Like the other [former members of Local 295's Executive Board], Delsardo chose to deliberately ignore the indicia that Local 295 is in the grip of a corrupt element:

"Q: When these things kept happening, the FBI visit, the FBI search of those offices, indictment of Calise, and the indictment of Calagna, Calise's guilty plea, then Calagna's guilty verdict, did you or any other member of the board ever discuss the fact that Local 295 might have a problem that the officer's should look into?

A: No.

Q: ... Did you or any other member of the board ever look into these matters?

A: No."

Tr. 736–37; *see id.* at 740. The testimony of each of the other respondents was consistent with this corrupt refusal to act. *E.g.,* Tr. 669–74 (Moran); Tr. 752–753, 776–79 (Cataldo); Tr. 801–02, 804–05 (Calagna, Jr.); Tr. 882–96 (Urso–Pernice). *Quoted in* Decision of Independent Administrator, June 14, 1991 (Lacey), Lehmann Ex. 1 at 17. *See also, id.* at 13–15 *reprinting excerpts of* Tr. Reinhardt).

In summary, the evidence exhibits more than simply a failure by the Executive Board to act affirmatively in the face of substantial evidence of corruption. Local 295's officers closed ranks against the government's investigation. They agreed to pay attorney's fees for Calagna and to increase his salary, to establish a severance plan for each other, to continue paying Davidoff a handsome monthly salary, and to try to evade detection.

In 1985, after Calise and Davidoff were indicted, the Local 295 Executive Board asked Davidoff's then attorney and later Calagna's attorney, Michael Pollack, to have Local 295's offices swept for electronic surveillance devices. In testimony before the Investigations Officer, Pollack described their motive: the "union was concerned that employers were eavesdropping on them and there also was a concern about law enforcement". *Quoted in* Decision of Independent Administrator, June 14, 1991 (Lacey), Lehmann Ex. 1 at 18. ▪ These derelictions by the officers and Board members are, of course, chargeable to the Local itself. A union may be held accountable for the acts of its officers,

*see United States v. Local 30,* 686 F.Supp. 1139, 1166 (E.D.Pa.1988), and liable based on its authorization of its officer's general activity. *Charles D. Bonanno Linen Serv., Inc. v. McCarthy,* 708 F.2d 1, 12 (1st Cir.1983) ("knowing tolerance" of illegal activity sufficient to uphold monetary award against local union for its representative's failure to control violence); *United Bhd. of Carpenters, v. United States,* 330 U.S. 395, 410, 67 S.Ct. 775, 783, 91 L.Ed. 973 (1947) ("knowing participation by the union in the operation of the illegal agreement after its execution").

In any event, the corruption in Local 295 extended beyond the leadership to the membership itself. In 1991, Carmelo Amato, a former shop steward of Local 295, and Thomas Greco, an employee at Stair Cargo, pled guilty to an extortion conspiracy involving Stair Cargo Services, Inc.. The conspiracy continued through July, 1989. *United States v. Guerrieri, Calise, Greco, Amato,* 89 CR 307(s) (E.D.N.Y. May 31, 1991) (Nickerson, J.).

When a special meeting of the general membership was called to consider payment for Calagna's criminal defense, a majority of the 100 to 200 members present out of a total membership of 1,500 to 1,600 approved the payment. While this does not establish the general membership's complicity in illegal activities, it does illustrate the ability of the Local's officers to maneuver the general membership into sanctioning the Executive Board's embezzlement. As former Local 295 Secretary–Treasurer Michael Urso–Pernice testified in a deposition on September 5, 1990 pursuant to the International Teamsters Consent Decree:

I think [Vice President Reinhardt] explained the charges, and he didn't think [Calagna] was guilty, the charges were a little ridiculous or whatever you want to say and [Calagna] wanted to know if we could use their money to pay for his fees. Then I believe Anthony [Calagna] got up and spoke too. I forget what he said and then we took a vote [which passed] after that.

(Lehmann Ex. 26 at 107–08).

In addition to the criminal activities of Anthony Calagna, Frank Calise, and Car-

melo Amato, the Local has been associated with an array of other federal indictments and convictions.

In *United States v. Vincent Santa and Thomas Orlando*, 86 CR 303 (E.D.N.Y. Feb. 4, 1987) (McLaughlin, J.), the defendants were indicted and later convicted for extortion and conspiracy to commit extortion by threatening work stoppages and labor unrest involving Local 295 and Local 851. In *United States v. Salvatore Reale and George Parker*, 86 CR 302 (E.D.N.Y. February 4, 1988) (Weinstein, J.), Reale pled guilty to extortion charges for threatening air freight companies with interference from Local 295. In *United States v. Frank Cammarano*, 89 CR 654 (E.D.N.Y. March 30, 1990) (Glasser, J.), Cammarano was convicted of a similar offense. In *United States v. Parker*, 88 CR 026 (E.D.N.Y. December 22, 1988) (Weinstein, J.), Local 295 employer George Parker pled guilty to extorting money from air freight companies by threatening to have Local 295 and Local 851 unionize non-union employees.

Defendants' contention that Local 295 is now free of the influence of organized crime rings hollow. Previous assertions that all corruption had been eliminated from the Local proved wrong, and the recent convictions and pleas of its officers argue for continued, close scrutiny.

Significantly, after former Judge Lacey stayed the removal of all but one member of Local 295's Executive Board, the Executive Board on June 24, 1991 sent the membership a "Notice of Special Elections" to replace the removed officers. This special election violated both the International Teamsters Constitution and the Local 295 By–Laws.

For example, the "Notice of Special Elections" announced that "the 50% meeting attendance requirement shall not be enforced as a condition of eligibility to run for office in this election". The Investigations Officer characterized this recent act of Local 295's officers as "designed to allow [the Executive Board] to select their own replacements, unfettered by the Local 295 by-laws and to suit the purposes of the Local's organized crime masters".

This court concludes that there is a likelihood of continued corruption and that the court should appoint a trustee. The record establishes a variety of illegal practices, including efforts to evade detection and prosecution; extensive corruption of the Local's officers and involving the membership; the persistence of corruption over a number of years despite changes in leadership; and a distinct lack of effort to eliminate corruption, by such means as independent auditing, periodic investigations, effective grievance procedures, and independent monitoring of elections.

### C.

Defendants claim that replacing the Temporary Trustee or changing his status to a consultant would undermine his ability to negotiate 91 collective bargaining agreements, each of which would last for three years and would effectively destroy the Union's bargaining position with all employers.

Defendants thus pose a trade-off between a trustee capable of vigorously representing the union members and one with investigative experience. That trade-off need not exist. Even if a trustee with investigative expertise is inexperienced in labor negotiations, some arrangement is surely possible with the present trustee— as a consultant, a deputy, etc.—retaining some responsibility for such matters.

### IV.

Before appointing and specifying the powers of the Trustee, the court must determine the source of funding for the Trusteeship. The court directs the parties to submit within 20 days of date of this memorandum and order papers addressed to this matter.

In an appearance before Judge Edelstein, the United States stated that it would propose to use $65,000 in a fund available for the victims of extortions and other RICO violations at Local 295 to finance the trusteeship. The parties should discuss the legal and practical propriety of using this

and other sources of funding. The court will consider investing the Trustee with the powers suggested by the United States, but declines to define the terms of the Trusteeship until the court can determine available resources.

Based on its experience with similar RICO trusteeships, the United States will submit, within twenty one days, cost estimates of administering Local 295 as well as of investigating possible corruption.

Counsel for both parties shall also submit, within twenty days, no more than three nominees each for the Trustee, along with the nominees' qualifications.

So ordered.